UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Joseph L. Paul,
    *Plaintiff*,                                    Civil No. 3:08cv1066 (JBA)

        *v.*

Bank of America,                                    January 29, 2010
    *Defendant*.

RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Joseph L. Paul brings suit against his former employer, Defendant Bank of America ("BOA" or the "Bank"), alleging that his termination was motivated by his race and age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*.; that he was retaliated against by BOA in violation of Title VII and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-58, 46a-60(a)(1) and (a)(4); that BOA's actions constituted fraudulent misrepresentation; and that BOA breached a covenant of good faith and fair dealing. Defendant has moved for summary judgment, which, for the reasons stated below, will be granted on the statutory counts.

I.      Background

At oral argument, the parties agreed that the following facts are not in dispute. Mr. Paul was born in 1947, and is African American. He was first employed by FleetBoston Financial Corporation ("Fleet") in 1968, and worked as a part-time computer operator. (Paul Aff., Ex. 4 to Sweeney Aff. [Doc. # 43], at ¶ 1.) Over the course of the next 35 years, Mr. Paul worked his way up through Fleet, holding a variety of other positions, including

Vice President overseeing major check processes in Hartford, Connecticut and Senior Vice President of Fleet's operations in Albany, New York.  He served as Senior Vice President in Albany until 2004.

In late 2003 or 2004, Mr. Paul's supervisors at Fleet first broached with him the idea of promoting him to Client Manager in Government Banking, which would have required Plaintiff relocating to Connecticut.  (Paul Dep., Ex. 1 to Sweeney Aff., at 20:6–17.)  Client managers are sales professionals who sell financial products and services.  (Scopelianos Aff. [Doc. # 44] at ¶ 8.)  Their primary responsibilities are to "increase revenues through existing and new business and ensure customer satisfaction and delight."  Each year, client managers are given annual sales goals for both "closed pipeline" (meaning new business revenue) and total revenue.  The Bank's primary focus for client managers  is on increasing closed pipeline, because if client managers develop new revenue streams, in addition to maintaining existing business, total revenue grows.

Mr. Paul alleges that he was offered the Client Manager job because he is African American, and Fleet—and now BOA[1]—have made a concerted effort to employ African Americans in that specific position because it oversees the account for the Connecticut State Department of the Treasury, a major client of the bank, and State Treasurer Denise Nappier "wants to deal with the bank who produces a black individual to interface with that office." (Paul Dep. at 236:17–24.)  Mr. Paul's immediate predecessor in the position, Wil Noel, an African American, held the Client Manager job until he left the Bank.

Although he was free to decline the offer, Mr. Paul "felt that if [his] career was to continue to advance, [he] should take a long hard look at it."  (*Id.* at 21:2–11.)  Based on his

---

[1] Fleet merged with BOA in April 2004.

view that "when senior management offers you a position that advances your career, it's best to take it, in the name of helping out the company" (*id.* at 20:21-24), Mr. Paul accepted the promotion offer, recognizing that it was an advancement for his career and entailed a pay raise from $123,500 to $138,000.

Prior to accepting the Client Manager position, Mr. Paul voiced his concerns that he lacked sufficient training and skills to be a client manager in the Government Banking department; particularly, he believed he needed training in reading financial statements and call preparation. When the job was offered to Mr. Paul, he had received some training that was applicable to the Client Manager position, and he says he was given verbal assurances that he would be "provided training, and given ample time to learn the position." (*Id.* at 33:12–15.) When Fleet merged into BOA, Mr. Paul was told that he would be retained as Client Manager and "given the same ability to learn the job" as he would have had with Fleet. (*Id.* at 36:11–37:19).

When Mr. Paul began working as Client Manager in Connecticut, his largest client was the State of Connecticut. Over the course of 2004, he was supervised first by George Hartman and then by Mark Droege, and his supervisor throughout 2005 was John McWeeney. Mr. Paul was satisfied with the on-the-job training and training seminars he attended while supervised by Hartman, Droege, and McWeeney, and he recounts that they were content with the progress he made as he learned new skills. Through on-the-job training, including "reaching out to client managers to find [out] how they were doing their job" (*id.* at 186:2–8) and "picking people's brains" (*id.* at 179:2–7), Mr. Paul was "learning more about how to do call prep [and] taking a look at trying to understand financial statements" (*id.* at 178:15–21). To round out his training experience, he took additional

courses.  In 2004, concerned that he could not adequately read financial statements, Mr. Paul attended a course—provided to all Client Managers—designed to teach that skill.  He felt that he was unable to appreciate the training fully and get enough out of it, however, because it was intended for participants who were "experienced client manager[s] who already knew how to read financial statements." (*Id.* at 45:22–45:1.)  Mr. Paul wanted to learn the fundamentals of interpreting such statements, and "there was nothing that went over the fundamentals." (*Id.* at 46:2–4.)  While supervised by McWeeney, Mr. Paul also attended an all-day seminar on call preparation with all of the other client managers.

During 2004 and 2005, Mr. Paul was felt he was progressing and was "extremely" satisfied with his performance as client manager.  (*Id.* at 49:1–12.)  Although Mr. Paul was told by his supervisors that he was "meeting expectations" (*id.* at 59:6–12), he was not meeting revenue production goals.  McWeeney, who told Mr. Paul that he was satisfied with Plaintiff's performance and that Plaintiff should "keep doing what [he had] been doing" (*id.* at 56:7–10), also told Mr. Paul that he "needs to become even more targeted and focused in pipeline development efforts, and he needs to create a greater sense of urgency" (*id.* at 173:18–174:1).

In June 2006, Margaret Scopelianos replaced McWeeney as Market Executive on the Commercial Government Banking team for the Northeast and as supervisor of client managers, including Mr. Paul.  According to Mr. Paul, she "wanted to hit the ground running." (Paul Dep. at 176:14–20.)  She was not satisfied with the progress he made through on-the-job training at work, although Mr. Paul's previous supervisors were.  Whereas previous supervisors proactively offered Mr. Paul training opportunities, Scopelianos took a more passive role; she told Mr. Paul to "take a look" at the training

4

opportunities offered by the Bank, on online list, and "see which ones meet your training needs, and put that in as one of your goals for 2007." Mr. Paul followed Scopelianos' guidance, listing training goals for 2007 and finding training opportunities provided by the bank that would cover some of his training needs. He took a course in 2006 on credit that he believed was designed for experienced Client Managers. The Bank did not provide training in some areas he had identified as goals, including "understanding financial statements, deri[v]atives, [and] hedge funds." (*Id.* at 177:11–19.) So Mr. Paul began to look outside the Bank for training opportunities, although he was felt he was unable to take any such courses because he was working 70 hours a week. Scopelianos never criticized Mr. Paul as lacking training and never denied him any requested training opportunity.

Mr. Paul felt frustrated by the lack of feedback and support from Scopelianos. Other Client Managers such as Jay Ryan confirmed to Mr. Paul that they, too, were not being provided with guidance on how to generate closed pipeline revenue or other feedback. Mr. Paul characterized the lack of feedback as "a common thing." (*Id.* at 215:20–216:21.)

Prior to Scopelianos becoming Market Executive, the Bank set Mr. Paul's closed pipeline annual goal for 2006 at $5 million. His actual closed pipeline revenue for 2006 was $1.12 million, the lowest of the Client Managers on Scopelianos' team, a 48 percent drop-off from 2005 and only 22.4 percent of his $5 million goal. Only two client managers on Scopelianos' team of six had drop-offs from 2005 to 2006. The other, a 44 year-old African American woman, had a decline of 12 percent and met 60 percent of her goal. Her sales improved significantly the next year, and by April 2007, she had the third-best performance results of the six Client Managers on Scopelianos' team. Another Client Manager, a 52 year-old white male who also had low closed pipeline revenue for 2006, met with Scopelianos

throughout late 2006 and left the Bank before the end of 2006.  Had he stayed, Scopelianos would have placed him on a probationary "corrective action plan."  Mr. Paul was the only Client Manager reporting to Scopelianos not to establish a new relationship with a client or "logo" in 2006.  Nonetheless, Mr. Paul was the second highest Client Manager in terms of total revenue.

Although she never gave him a written evaluation of his job performance, Scopelianos met with Mr. Paul several times in 2006 and 2007, echoing McWeeney's feedback that he had to work on his ability to drive new business.  In addition to expressing concern with his objective performance indicators, Scopelianos says she noted that Mr. Paul's attitude and approach to the job were not conducive to success.[2]

On January 31, 2007, based on Mr. Paul's performance in 2006, Scopelianos estimated his 2007 closed pipeline goal at $3.8 million for purposes of setting his quarterly targets.  This number was reduced to $3 million, a goal he believed could reasonably be reached.  On February 8, 2007, Scopelianos met with Mr. Paul to discuss his progress and told him she would like to see him improve in three areas: 1) taking ownership of his role as a team leader; 2) accountability for his team's performance; and 3) inspiring his team in e-mails and communications.  On February 22, 2007, Scopelianos met with Mr. Paul and

---

[2] Scopelianos attended a client luncheon with Mr. Paul and an executive from a client, the Connecticut Housing Finance Authority ("CHFA") and avers that Mr. Paul was not prepared for a business discussion and did not have background information on the client readily available. Her impression after the lunch was that Mr. Paul "took a passive approach to his job and considered himself to be in a customer service role rather than sales and business development role."  (Scopelianos Aff. at ¶ 18.)  However, Gary King, the President and CEO of CHFA while Mr. Paul was at BOA, was "continuously impressed with Mr. Paul's management and leadership ability to maintain, expand and support the Bank's performance with CHFA."  (King Aff., Ex. A. to Pl.'s Mem. Opp. [Doc. # 57], at 1.)

told him that because of his performance deficiencies, he had a choice between submitting to a formal corrective action plan or conducting a 60-day internal BOA job search for a another position. A corrective action plan would be a "formal action" constituting employment probation, and if he did not meet performance and revenue goals, his employment could be terminated. Mr. Paul refused to choose either option presented to him. He left Scopelianos a telephone message at the end of February or early March telling her he "wasn't going to just choose anything" and that he was "just going to let her do what she needed to do." (Paul Dep. at 322:1–7.) Mr. Paul's attorney at that time, Joseph Moniz, wrote a letter dated March 2, 2007 threatening to take legal action under Title VII on the basis that her proposed February 22, 2007 discipline was discriminatory. On March 21, 2007, after consulting with the Bank's human resources department, Scopelianos issued a written warning to Mr. Paul, placing him on corrective action.

Throughout early 2007, Paul worked on a deal with the Connecticut State Department of Public Utilities ("DPUC"), which he believes would have generated at least $1.5 million in revenue for the year. The deal was for BOA to provide lease financing to energy start-ups through DPUC. On April 3, 2007, Kristine Millet, the Senior Information Officer in Commercial Banking, sent an email to Mr. Paul, Scopelianos, and other Bank executives indicating that Mr. Paul would receive closed pipeline credit for the deal because he played an instrumental role in organizing it. Virginia Roberts, the Bank's Sales Performance Manager for Northeast Government responded on April 11, 2007, having "confirmed with Kristine [Millet]" that in keeping with Bank policy, because the credit risk for individual deals with energy companies seeking financing through DPUC "is at the operating entity, non government clients will be booked in the area which is taking the credit

risk." (DPUC e-mail correspondence, Ex. A. to Pl.'s Mem. Opp., at 1.)  Roberts explained

that "Joe Paul will get the credit he deserves[,] but the individual deals will flow to the line

of business where the credit risk is taken." (*Id.*)  While the DPUC deal would reflect well

upon Mr. Paul, it would not count towards his objective closed pipeline numbers.

Scopelianos avers that it is BOA policy that "when dealing with a governmental

conduit"—here, DPUC—"sales credit goes to the individual who has the relationship with

the underlying entities who participate in the program" regardless of who may have

negotiated the specific deal with the conduit. (Scopeliano Aff. at ¶ 36.) Because Mr. Paul's

clients did not borrow money from the Bank through DPUC, he was not awarded any

revenue credit for the deal.  In spite of Mr. Paul's protestations to her, Scopelianos avers that

"the mere referral of business, while valued and recognized by the Bank, does not warrant

revenue sales credit." (*Id.*)

Over the next several months, Mr. Paul continued to meet with Scopelianos as part

of the formal performance management process required by his corrective action plan, and

she continued to observe subpar performance and results.  On June 15, 2007, she issued a

final written warning, based largely on his year-to-date closed pipeline results.  In mid-July,

in light of his closed pipeline total of $208,000 against a year-to-date goal of $1.5 million, she

informed Mr. Paul that his employment was terminated.  He was replaced by Wil Noel, who

had previously filled that Client Manager position.

II.     Summary Judgment Standard

Summary judgment is appropriate where the record after discovery "show[s] that

there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c)(2).  An issue of fact is "material" if it "might affect

the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of showing that [it] is entitled to summary judgment." *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249.

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant "need not prove a negative," but "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in his favor." *Id.* (quotation omitted, second alteration in original). If the record as a whole, viewed in the light most favorable to the non-moving party, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment should follow. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quotation marks omitted).

III.    Discussion

A.      Title VII, CFEPA, and ADEA discrimination

Mr. Paul claims that BOA violated Title VII and CFEPA by promoting him on the basis of his race to a position held only by African American job candidates and then denying him the training and support necessary for success, resulting in his termination for

9

poor performance.[3]  He claims that BOA violated the ADEA because he was the oldest and most highly paid Client Manager in his division and the only Client Manager in Scopelianos' group put on corrective action.

At the summary judgment stage in both Title VII and ADEA cases,[4] applying the *McDonnell Douglas Corp. v. Green* burden shifting test, 411 U.S. 792, 802 (1973), "a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001).  Initially, a plaintiff must establish a *prima facie* case of discrimination under both statutes by making a *de minimis* showing that

> (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.

*Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 803).  On the fourth factor, it is sufficient that a rational finder of fact be able to draw any inferences of discrimination; "it is not the province of the summary judgment court to decide what inferences should be drawn."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (rational finder of fact could infer discrimination in

---

[3] Although Plaintiff's counsel referred during oral argument to Mr. Paul's hostile work environment as a Client Manager in Hartford, such a claim has never been asserted, and there is no evidence in the record of a hostile work environment based on race or age.

[4] Because federal law guides analysis of Connecticut's anti-discrimination statutes, *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103 (1996), Mr. Paul's federal anti-discrimination and CFEPA claims will be analyzed together.

termination of plaintiff's employment based on defendant's immediate effort to hire someone with the same qualifications and on plaintiff's prior satisfactory work performance).  Here, Plaintiff points to his good performance notwithstanding his closed pipeline revenues, long service to the Bank, and replacement by Wil Noel.

The Court will assume without deciding that Mr. Paul has met his *de minimis* burden of establishing a *prima facie* case of race and age discrimination under Title VII and the ADEA, because Plaintiff's evidence supporting the fourth prong rests upon the same evidence he offers to rebut BOA's proffered legitimate reason for his termination.  *See Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002) (discussing how the *prima facie* and pretext analyses can "tend to collapse as a practical mater").  Therefore, the Court next considers BOA's evidence of the reasons for its adverse employment action.

The Bank's proffered reason for placing Mr. Paul on corrective action and terminating him is his continued deficient performance as a Client Manager.  Defendant's burden in advancing a non-discriminatory reason justification for termination is "one of production, not persuasion."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the *prima facie* case.  The defendant need not persuade the court that it was actually motivated by the proffered reasons."  *Fisher v. Vassar College*, 114 F.3d 1332, 1335–36 (2d Cir. 1997).

As a Client Manager, Mr. Paul never met his financial sales goals for closed pipeline revenue.  Mr. Paul's closed pipeline revenue numbers for 2006 and 2007 reflected the lowest annual goal percentage achieved of Client Managers on Scopelianos' team, white and African American.  He signed no new "logos" in 2006; his drop-off rate in closed pipeline revenue

11

from 2005 to 2006 was 48 percent, the highest among Scopelianos' team members; and he only brought in 22.4 percent of his closed pipeline goal for 2006. By July 2007, his closed pipeline for the first two quarters totaled $208,000 (or 13.9 percent) of a goal of $1.5 million for the first half of the year.

In addition to those objective performance measures, Mr. Paul received negative feedback about his approach to developing new business. Scopelianos echoed McWeeney's 2005 observation that he needed to become more focused in pipeline development efforts and approach client development with "a greater sense of urgency." On February 8, 2007, she told him that he needed to improve his leadership of his team, mainly by "tak[ing] ownership of his area of responsibility," "accept[ing] accountability for his team's performance," and "inspiring his team." In the March 2007 written warning to Mr. Paul, Scopelianos informed him that he was "[f]ailing to deliver results" and did not "[d]emonstrate deep and broad business acumen[; i]nspire commitment and followership[; b]uild broad-based business relationships across the organization;" or "[c]reate competitive, innovative business plans that drive short and long term growth." Based on this evidence, BOA has met its burden of production to proffer a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

The burden then shifts to Plaintiff to demonstrate pretext and that he was likely fired for discriminatory reasons. "A reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that the discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 504 (2d Cir. 2009) ("[P]laintiff carries the ultimate burden of persuasion and must produce evidence such that a rational finder of fact could conclude that

the adverse action taken against her was more likely than not a product of discriminatory animus."). Thus, at the summary judgment stage, a plaintiff must "produce not simply some evidence but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal citations and quotations omitted). The theory of Mr. Paul's Title VII discrimination claim, which he acknowledges is novel, is that because his race was a motivating factor in BOA's decision to *promote* him to Client Manager, and he was not thereafter afforded promised training to succeed in that position but was instead set up to fail in a position that BOA reserved only for African American employees, a jury could infer that race played a role in Defendant's discharge decision. Defendant argues that Mr. Paul's promotion to Client Manager was not an "adverse employment action," and that the unrebutted evidence shows that the performance goals used to evaluate Mr. Paul were not discriminatory and that he received the same training and feedback as non-minority Client Managers.

Mr. Paul offers evidence of BOA's race consciousness with respect to his promotion. The Bank preferred to have an African American Client Manager to "interface" with the State Treasury Department. (Paul Dep. at 236:17–24.) White employees who, by some measures, were better qualified for the position than Mr. Paul were passed-over. (*Id.* at 68:2–71:13.) Plaintiff replaced and was replaced by Wil Noel, who is also African American. (*Id.* at 64:11–20.) The State Department of Treasury was Mr. Paul's biggest client, and it was important to the State Treasurer that BOA hire minority candidates for visible high level positions. (*See* Paul Dep. at 236:17–24; *see also* King Aff., Ex. A to Pl.'s Mem. Opp. at 1

("[T]he employment of an African American in a visible, high level position . . . was a critical issue for me and the CHFA Board of Directors, particularly the State Treasurer.").)

However, Mr. Paul's promotion to Client Manager, even if made with a race conscious motivation, was not an employment action "adverse" to Plaintiff, for whom it was a career advancement and salary increase.  *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("A plaintiff sustains an adverse employment action if he or she endures a materially *adverse* change in the terms and conditions of employment.") (emphasis added).  Notwithstanding his evidence that race may have played a role in his promotion, Plaintiff has offered no evidence that his termination was a race-tainted decision other than he would not have been in the Client Manager position except for his race and age-related employment longevity.[5]   The undisputed record shows that the criteria Scopelianos used to evaluate Mr. Paul's performance was race-neutral, that he was given three years to train and succeed as a Client Manager, and that the termination decision was made by a supervisor who had played no role in his initial promotion to the position. Plaintiff offers no evidence beyond his mere speculation that he was set up to fail, and given the Bank's ostensible objective of maintaining a positive and profitable business relationship

---

[5]

Q:     Can I ask you this: So in February 2007, when [Scopelianos] says, [y]ou [h]ave this option, you can go on this Constructive Action Plan, or you can go on the sixty day job search, do you contend that [she] was making that decision because of your race, or was she making that decision because of what she believed your performance was?

A:     She is making that decision based on my race, because it was my race that got me in that position.  It was the race that got me overpaid for that position.

(Paul Dep. 257:10–258:13.)

with the State Department of Treasury by having Plaintiff in the Client Manager position, such an inference is illogical.

While evidence that performance measures were applied in bad faith can give rise to an inference of discrimination, *cf. Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997) ("Absent a showing by the plaintiff that the employer's demands were made in bad faith, an employer who is sued on allegations of . . . discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury.") (internal quotation omitted), Mr. Paul concedes that BOA's objective closed pipeline revenue metric was not discriminatory.  (Paul Dep. at 127:11–15 (Q: "[D]id you ever have the opinion that your $3 million closed pipeline goal was discriminatory, in any way?" A: "No"); *id.* at 136:15–21 (Q: "Are you claiming . . . that [Scopelianos] focused on closed pipeline revenue with you in a discriminatory manner either because of your age or your race?" A: "I'm claiming discrimination for other reasons than that.  That is not one of them.").)  On this record, no reasonable jurors could conclude that the Bank's proffered reason for his termination—his poor closed pipeline revenue performance and his failure to "satisfy the employer's honestly-held expectations," *Thornley*, 104 F.3d at 30—was pretextual or that discriminatory ill-will or animus underlay the use of closed pipeline revenue as a measure of his performance.

Acknowledging that Mr. Paul was held to the same standard as Scopelianos' other Client Managers, at oral argument Plaintiff's counsel argued that Scopelianos' emphasis on closed pipeline revenue impacted him disparately because he was promoted to that position not to generate new revenue but to "massage" BOA's relationship with Treasurer Denise Nappier.  Mr. Paul stated in his deposition that he "should not have been held to those same

standards" in generating closed pipeline revenue as other Client Managers and "should have been given the credit for maintaining and bringing business as a black person, because that's what the treasurer wanted to see and that relationship went a long way." (Paul Dep. at 419:3–11.) Although Mr. Paul believes it was unfair for Scopelianos to hold him to the same standards for closed pipeline revenue, he acknowledges that she did not do so for any discriminatory purpose. It is not the role of the Court or the jury to second-guess the Bank's business judgment about what performance standards it will apply so long as it applies them non-discriminatorily. *See Byrnie*, 243 F.3d at 103 ("[The court's] role is . . . not to act as a superpersonnel department that second guesses employers' business judgments.").

Mr. Paul also says that he never had the training to read financial statements and prepare for calls necessary to succeed as a Client Manager. While evidence of disparate denial of training opportunities may support an inference of discriminatory intent under the ADEA and Title VII, *see Cross v. New York City Trans. Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (when training that was necessary for satisfactory performance was deliberately denied to older employees, there was an issue of material fact as to whether those employees' termination was motivated by age-based discrimination), Mr. Paul does not dispute Defendant's evidence that he was never denied a training opportunity that he sought or that was afforded to other Client Managers. Unlike *Cross*, in which members of a protected class were not given the same training materials and were not trained alongside younger employees, 417 F.3d at 250, the unrebutted record shows that Mr. Paul attended seminars with other Client Managers and received on-the-job training with and from younger, non-minority co-workers over the course of three-plus years even though he may not have benefitted from the training as much as others. He was invited by Scopelianos to establish

16

training goals and take any courses offered by the Bank in furtherance of those goals.  Mr. Paul acknowledges that his beliefs that he was denied training opportunities because of his race or age were only speculation.  (Paul Dep. at 257:10—258:13[6].)  This speculation, however, cannot substitute for evidence that Mr. Paul's training opportunities were limited in comparison to that provided to younger or non-minority employees.  Mr. Paul "has done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his race and/or age].  This is not sufficient."  *Grillo v. New York City Trans. Auth.* 291 F.3d 231, 235 (2d Cir. 2002).  "[A]bsent any concrete particulars," conclusory accusations of discrimination are insufficient to withstand a motion for summary judgment in a discrimination case.  *Meiri v. Dacon*, 759 F.3d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985).

Even if he had been promoted because of his race, and was older than other Client Managers because of his long-term employment with the Bank, Mr. Paul offers no evidence that Scopelianos discriminated against him.  Plaintiff conceded in his deposition that Scopelianos treated him "exactly . . . the same as other Client Managers," (Paul Dep. at 421:1–7[7]), and that she made the decision to place him on corrective action "regardless of

---

[6] "[I]t was the race that has now got me in a situation where I'll need additional training that she wasn't able to address.  So, yeah, race and age now, because I'm at the end of my career, is totally what's got me in this position.  Because to continue to train me, over the next four, five years, the bank may have—in [Scopelianos]'s mind, may have felt—well, I'm speculating.  Because you're trying to get me in [Scopelianos]'s head, and I don't know.  I can only speculate."

[7] Q:  "Is that how [Scopelianos] treated you differently than the other Client Managers?"  A:  "That's exactly how she treated me, the same as other Client Managers, without regard to the arrangement in which I was brought here to do the job in Connecticut."

[his] race" (*id.* at 258:21–23[8]).  There is no evidence in the record that he was afforded lesser opportunities or worse treatment compared to non-minority or younger Client Managers.[9] It is undisputed that a white, 52 year-old Client Manager on Scopelianos' team who had low closed pipeline revenue in 2006 would—like Mr. Paul—have been put on corrective action had he stayed at the Bank, potentially leading to termination.  An African American woman who experienced a significant drop-off in her closed pipeline revenue from 2005 to 2006 was not put on corrective action because she demonstrated significant subsequent improvement in her performance.  Plaintiff has not rebutted as pretextual Defendant's assertion that in spite of three years experience and unfettered access to training opportunities Mr. Paul did not perform well as a Client Manager compared to other Client Managers.  Plaintiff's claim that his job as Client Manager was different from the others' has no basis since the unrebutted record shows that Plaintiff's replacement generated $2.862 million in closed pipeline revenue in his first full year upon returning to the position and is one of Scopelianos' "best performing" Client Managers (Scopelianos Aff. at ¶ 43).

Since BOA's proffered legitimate, non-discriminatory reason for terminating Mr. Paul's employment has not been rebutted by any evidence of racial or age-based animus or

---

[8] Q:  "So you do believe that [Scopelianos] putting you on a corrective action or giving you the option of leaving the bank was based on your race; you think she was making that decision because you're [a] black man, not based on your performance, but based on your race?" A:  "She is making that decision regardless of my race, even."

[9] During oral argument, Plaintiff's counsel referred to a white Client Manager, Pat Gilbert, who he claimed was promoted despite low closed pipeline revenue.  Although Mr. Paul mentioned Gilbert during his deposition (Paul Dep. at 60:4–19), there is no evidence in the record that Gilbert had low closed pipeline revenue or was promoted.  Plaintiff's counsel also referred to a white woman with low closed pipeline revenue who left the Bank prior to being placed on corrective action.  The record is silent to any such circumstances.

ill-will or more favorable treatment of similarly-situated non-minority, younger Client Managers, Plaintiff has failed to demonstrate the existence of any material fact in dispute requiring resolution at trial, and Defendant's motion for summary judgment must be granted on Mr. Paul's Title VII, ADEA, and CFEPA claims.

> B.     Title VII and CFEPA Retaliation

Mr. Paul also alleges that BOA retaliated against him for asserting his belief, through counsel, of Defendant's violation of Title VII and the CFEPA. A *prima facie* retaliation claim requires evidence (1) that his attorney's letter to Defendant constituted protected activity, (2) that BOA was aware of this activity, (3) that he suffered an adverse employment action, and (4) that there was a causal connection between his protected activity and the adverse action. *Collins v. New York City Trans. Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). If a plaintiff meets his minimal *prima facie* burden and the defendant counters with legitimate justifications for its actions, then the plaintiff must offer evidence sufficient to support the inference that the proffered reasons are likely pretext for retaliation. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1181 (2d Cir. 1996).[10]

Mr. Paul claims that in response to the letter submitted by Attorney Moniz to Scopelianos threatening legal action under Title VII, Scopelianos placed him on corrective action and did not give him closed pipeline revenue credit for the DPUC deal, thus depriving him of revenue credit to which he was entitled and opening the door for his termination.

---

[10] Defendant does not dispute that Mr. Paul has established the first three elements of a *prima facie* case of retaliation. Defendant does, however, dispute whether there is any evidence of a causal connection between the attorney letter threatening legal action and Scopelianos' decision to place Mr. Paul on corrective action, arguing that because adverse corrective action had been threatened before the letter, an inference cannot be drawn that the letter prompted the corrective action.

He argues that the close temporal proximity—less than three weeks—between the letter and his being placed on a corrective action plan supports an inference of retaliatory motive. Indeed the Second Circuit has "consistently held that proof of causation can be shown . . . by showing that the protected activity was followed closely by discriminatory treatment." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Cifra v. G.E. Co.*, 252 F.3d 205, 218 (2d Cir. 2001) (only three days elapsing between protected activity and adverse action could give rise to inference of retaliation). That less than three weeks elapsed is sufficient evidence of causation to meet Plaintiff's *de minimis* burden in establishing a *prima facie* case of retaliation.

As described above, the reason proffered by the Bank for placing Mr. Paul on corrective action was his poor performance generating new business. Scopelianos avers that as of March 2007, "Plaintiff only had $87,000 in Closed Pipeline revenue, toward a quarterly goal of $750,000 and an annual goal of $3 million." (Scopelianos Aff. at ¶ 31.) BOA argues that reflective of Plaintiff's failing performance, corrective action was the next step in a progression of disciplinary action against Mr. Paul after he declined the option to pursue an internal job search. In response to Scopelianos' February 22, 2007 directive that he choose between corrective action or an internal BOA job search for alternative employment, he informed her that he "wasn't going to just choose anything" and would simply "let her do what she needed to do." His attorney's letter further indicated that Mr. Paul would not conduct a futile internal job search: "at Joe's seniority level after over 39 years with the Bank, he faces certain termination as there is no chance that an acceptable position would become available in the next two months." (Moniz letter, Ex. A to Scopelianos Aff., at 1.)

Mr. Paul has produced no evidence, other than the short period of time between the

20

Moniz letter and his placement on corrective action, that supports an inference of retaliation. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (discipline of plaintiff began five months prior to his filing complaint with Equal Employment Opportunity Commission and therefore could not give rise to inference of retaliation). Well in advance of the March 2007 Moniz letter, Mr. Paul had been told repeatedly by Scopelianos that he was underperforming, and he was not given a 2006 year-end bonus because of his failure to generate business (Scopelianos Aff. at ¶ 21). He was then offered a choice he declined to make and thus was placed on corrective action—one of the two choices—which was the next step and would lead to his improvement or termination. Because Scopelianos began taking disciplinary action prior to the March 2007 letter, Mr. Paul's evidence does not present evidence showing a triable retaliation claim. Defendant's motion for summary judgment must be granted on Mr. Paul's Title VII and CFEPA retaliation claims.

   C.    State law claims

   Having granted summary judgment against Mr. Paul on his federal and state statutory claims, the Court declines to exercise supplemental jurisdiction over his state common-law claims. "While the statute governing supplemental jurisdiction, 28 U.S.C. § 1367, does not require dismissal of pendent state-law claims where all of the federal claims have been disposed of, *see id.* § 1367(c)(3)," *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases), the Second Circuit "has held, as a general proposition, that 'if [all] federal claims are dismissed before trial . . ., the state claims should be dismissed as

well,'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) (alteration in *Uzan*).

IV.    Conclusion

For these reasons, Defendant's Motion for Summary Judgment [Doc. # 42] is GRANTED.  The Clerk is directed to close this case.

IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of January, 2010.